965 P.2d 770

The **ARIZONA LEGISLATIVE COUNCIL, Petitioner,**

v.

**Hon. Joseph D. HOWE, Judge of the Superior Court of the State of Arizona, In and For the COUNTY OF MARICOPA, Respondent,**

The **PEOPLE HAVE SPOKEN–HB 2518, a lawfully registered political committee; Jeff Singer, M.D., an individual, Real Parties in Interest.**

No. CV–98–0363–SA.

Supreme Court of Arizona, In Division.

Oct. 22, 1998.

Gallagher & Kennedy, P.A. by John E. Lundin, Elliot Talenfeld, Don D. Skypeck, Jeffrey D. Gross, Phoenix, for Petitioner.

Brown & Bain, P.A. by Paul F. Eckstein, John A. Buttrick, John J. Tuchi, Phoenix, for Real Parties in Interest.

Grant Woods, Arizona Attorney General by Thomas I. McClory, M. Colleen Connor, Phoenix, for Secretary of State, Arizona Attorney General.

## OPINION

FELDMAN, Justice.

¶1 A group calling itself The People Have Spoken—HB 2518 (People), a registered political committee under A.R.S. § 16–902.01, filed a special action in the superior court against the Arizona Legislative Council (Council), the Secretary of State, and the Attorney General. People sought an order enjoining or prohibiting the Secretary of State from publishing an analysis adopted by the Council in the voter publicity pamphlet to be produced prior to the November 1998

general election. People also sought to prohibit the Secretary of State from using similar language on the ballot itself. The superior court judge ruled in favor of People, and the Council seeks review of that ruling through this original special action.

## FACTS

¶2 The facts are uncontested. In 1996, Arizona voters approved Proposition 200, an initiative proposal that would allow Arizona physicians to prescribe Schedule I drugs,[1] including marijuana, heroin, and over 100 others, to treat a seriously or terminally ill patient if documented scientific research concluded that the drug would provide medical benefits for treatment of the patient's disease or condition and if a second physician concurred in writing. A doctor could prescribe such drugs even though no federal agency had approved them for medical use.

¶3 During its 1997 regular session, the Arizona Legislature passed, and the Governor signed, HB 2518, which amended Proposition 200 by providing that either Congress or the Food and Drug Administration (FDA) would have to approve marijuana for medical use and the Drug Enforcement Agency (DEA) would have to reclassify marijuana as something other than a Schedule I drug before it could be prescribed in Arizona.[2] Once marijuana is so approved and reclassified, Arizona physicians would then be free to prescribe not only marijuana but any other Schedule I drugs, even if those drugs had not been federally approved or reclassified. The other requirements of Proposition 200 were retained in HB 2518.

¶4 Needless to say, both Proposition 200 and the Legislature's attempt to amend it by HB 2518 were controversial. Before the effective date of HB 2518, People sought to refer it to the voters pursuant to Arizona Constitution article IV, pt. 1, § 1(3), which provides that five percent of the qualified electors "may order the submission to the people at the polls of any measure, or item, section, or part of any measure, enacted by the Legislature." People obtained well over the required 56,000 valid signatures on the

---

1. 21 U.S.C. § 812(c)(a) lists 42 drugs and states that "[u]nless specifically excepted or unless listed in another schedule, any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation" are Schedule I drugs: Acetylmethadol; Allylprodine; Alphacetylmethadol; Alphameprodine; Alphamethadol; Benzethidine; Betacetylmethadol; Betameprodine; Betamethadol; Betaprodine; Clonitazene; Dextromoramide; Dextrorphan; Diampromide; Diethylthiambutene; Dimenoxadol; Dimethylthiambutene; Dioxaphetyl butyrate; Dipipanone; Ethylmethylthiambutene; Etonitazene; Etoxeridine; Furethidine; Hydroxypethidine; Ketobemidone; Levomoramide; Levophenacylmorphan; Morpheridine; Noracymethadol; Norlevorphanol; Normethadone; Norpipanone; Phenadoxone; Phenampromide; Phenomorphan; Phenoperidine; Piritramide; Proheptazine; Properidine; Racemoramide; Trimeperidine.

   Subsection (b) lists an additional 22 Schedule I drugs, stating that "[u]nless specifically excepted or unless listed in another schedule, any of the following opium derivatives, their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:" Acetorphine; Acetyldihydrocodeine; Benzylmorphine; Codeine methylbromide; Codeine–N–Oxide; Cyprenorphine; Desomorphine; Dihydromorphine; Etorphine; Heroin; Hydromorphinol; Methyldesorphine; Methylhydromorphine; Morphine methylbromide; Morphine methylsulfonate; Morphine–N–Oxide; Myrophine; Nicocodeine; Nicomorphine; Normorphine; Pholcodine; Thebacon.

   Subsection (c) lists an additional 17 Schedule I drugs, stating that "[u]nless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:" 3,4–methylenedioxy amphetamine; 5–methoxy–3,4–methylenedioxy amphetamine; 3,4,5–trimethoxy amphetamine; Bufotenine; Diethyltryptamine; Dimethyltryptamine; 4–methyl–2,5–dimethoxyamphetamine; Ibogaine; Lysergic acid diethylamide; Marihuana; Mescaline; Peyote; N–ethyl–3–piperidyl benzilate; N–methyl–3–piperidyl benzilate; Psilocybin; Psilocyn; Tetrahydrocannabinols.

2. Section 5 of HB 2518 states in pertinent part:

   Sections 2 and 4 of this act do not become effective unless the United States Congress authorizes the medical use of marijuana or unless the federal food and drug administration authorizes the medical use of marijuana and the drug enforcement administration reschedules marijuana to a schedule other than schedule I.

referendum petitions. Thus HB 2518, designated as Proposition 300, will be on the November 3, 1998 general election ballot. A "yes" vote will validate the legislative amendment to Proposition 200; a "no" vote will leave Proposition 200 in its original form.

¶ 5 Under our constitutional provisions and the statutes implementing them, proponents and opponents of an initiative or referendum proposal may file arguments with the Secretary of State, who is required to print those arguments in a publicity pamphlet to be mailed to all registered Arizona voters before the election. For details of the procedure and its history, see *Fairness & Accountability in Insurance Reform v. Greene,* 180 Ariz. 582, 587–88, 886 P.2d 1338, 1343–44 (1994). A.R.S. § 19–123(A)(4) also provides that the publicity pamphlet must contain "a legislative council [3] analysis of the ballot proposal as prescribed pursuant to A.R.S. § 19–124." Section 19–124(B) adds more procedural detail and requires the Council to provide an analysis of the proposal for inclusion in the publicity pamphlet. The analysis is to be "an impartial analysis of the provisions of each ballot proposal ... [including] a description of the measure ... written in clear and concise terms avoiding technical terms wherever possible." The analysis "may contain background information, including the effect of the measure on existing law." *Id.*

¶ 6 Council staff prepared a draft analysis of the referendum proposal. At the Council's July 7, 1998 meeting, the draft was considered, amendments were suggested by Council members, and a revised draft was approved on July 9. On July 24, People filed its superior court special action attacking the analysis as misleading, incorrect, and biased on a number of grounds. People also claimed the Secretary of State had not properly prepared the descriptive title of the proposition for the official ballot. That title is to contain

a summary of the principal provisions of the measure, not to exceed fifty words,

which shall be prepared by the secretary of state and approved by the attorney general. Immediately following the descriptive title of each measure there shall be printed [on the ballot] the phrases:

A "yes" vote shall have the effect of [to be filled in]   .

A "no" vote shall have the effect of    [to be filled in]   .

A.R.S. § 19–125(D). The Secretary of State attempted to comply with these instructions by using language similar to that in the analysis prepared by the Council for the publicity pamphlet. The language used on the ballot was approved by the Attorney General.

¶ 7 The Council met in public session on July 29, after the superior court action was filed. It heard from People's representatives and then revised the analysis to resolve some of People's objections but rejected several other revisions requested by People. After the July 29 revisions, the analysis read as follows:

### ANALYSIS BY LEGISLATIVE COUNCIL

(In Compliance with A.R.S. § 19–124)

In 1996, the voters passed the Drug Medicalization, Prevention and Control Act of 1996. The Act allowed medical doctors to prescribe 116 Schedule I drugs, including heroin, LSD, marijuana and certain analogs of PCP to treat a disease or to relieve the pain and suffering of a seriously ill or terminally ill patient.

After the 1996 Act passed, the State Legislature enacted House Bill 2518. Before the 116 Schedule I drugs could be prescribed by a doctor, House Bill 2518 requires marijuana to be authorized by the federal food and drug administration or be authorized by the United States Congress. This proposition and the 1996 Act would conditionally allow a doctor to prescribe a

---

3. The Arizona Legislative Council is established by A.R.S. § 41–1301, and its powers and duties are set forth in § 41–1304. In addition to preparation of ballot analyses for the publicity pamphlets, the Council has a variety of other functions. *See Greene,* 180 Ariz. at 588, 886 P.2d at

1344. Its members are the Senate President, six Senate members appointed by the President, the Speaker of the House, and six House members appointed by the Speaker. *See* A.R.S. § 41–1301(A).

Schedule I drug to seriously ill or terminally ill patients. Before prescribing a Schedule I drug, the doctor would have to document that scientific research supports the use of the drug and would have to obtain from a second doctor a written opinion that prescribing the drug is appropriate. A patient who receives, possesses or uses the drug, as prescribed by a doctor would not be subject to state criminal penalties.

If this proposition passes, doctors could begin prescribing Schedule I drugs, including heroin, LSD, marijuana and certain analogs of PCP, only after the federal food and drug administration approves or the United States Congress authorizes the medical use of marijuana or reclassifies marijuana as a drug that doctors can prescribe. If this proposition does not pass, under state law doctors could continue to prescribe Schedule I drugs, including heroin, LSD, marijuana and certain analogs of PCP, without any further authorization from Congress or the FDA.

¶ 8 Dissatisfied with the final wording, People pursued their superior court special action. The trial judge granted relief on July 31, 1998, concluding that the Council's analysis failed to satisfy A.R.S. § 19–124 because it did not comply with the requirement of impartiality and was not written in clear and concise terms. The judge also concluded that the Secretary of State failed to comply with A.R.S. § 19–125 in preparing the descriptive title and the "yes/no" language. The judge thus ordered modification of the Council's analysis as well as the ballot's descriptive title and "yes/no" language. He further ordered that if the Council did not provide the Secretary of State "with a substitute analysis of Proposition 300 that meets with this court's directives, the pamphlet shall be printed without any Legislative Council analysis of Proposition 300."

¶ 9 The Council then challenged these orders by original special action in this court. *See* Rule 1, Ariz.R.P.Spec.Act. Following oral argument, we accepted jurisdiction and vacated the trial judge's order, stating that the Secretary of State "may print the ballots in accordance with the Council's July 29 analy-

sis and with the descriptive title and 'yes/no' language prepared by the Secretary of State." We also stated that this opinion would follow.

## DISCUSSION

### A. Jurisdiction

#### 1. Special action jurisdiction

¶ 10 · Our constitution gives us original jurisdiction over "mandamus, injunction and other extraordinary writs to state officers." Ariz. Const. art. VI, § 5(1). We generally exercise this jurisdiction through special action proceedings. *See* Rule 1, Ariz. R.P.Spec.Act. As with common-law writs, our decision to accept special action jurisdiction is highly discretionary. Given the time constraints for printing and mailing the publicity pamphlets in this case, as in *Greene*, there was no adequate remedy by any other procedure or in any other forum. Hence we accepted jurisdiction and decide the matter on the merits. *See Greene*, 180 Ariz. at 586, 886 P.2d at 1342.

#### 2. Subject matter jurisdiction

¶ 11 In *Greene*, after a thorough analysis of the evolution of the constitutional and statutory procedure for submitting initiatives and referenda to the people and the Council's origin, functions, and nature, we concluded that judicial review extends to the Council's implementation of the statutory requirement that it provide analyses of all initiative and referendum measures for the publicity pamphlet. 180 Ariz. at 589–90, 886 P.2d at 1345–46. We see no purpose in repeating our reasoning and think it sufficient to restate our conclusion from *Greene*: "Section 19–124 would be meaningless if this court had no power to review the [ministerial] actions of the Council and determine whether it carried out its statutory responsibility to prepare an impartial analysis and description of" initiative and referendum proposals. *Id.* at 590, 886 P.2d at 1346.

¶ 12 Acknowledging that *Greene* settled the general issue of subject matter jurisdiction, the Council nevertheless argues that such jurisdiction extends only to review of

the Council's actions on initiative proposals and contends that *Greene* "expressly differentiated between initiatives and referenda," quoting the following passage from *Greene:*

We address an initiative proposal that began with the people by virtue of petitions signed by over 400,000 Arizonans. This is not a referendum proposal that the legislature originated and referred for popular ratification. The legislature did not draft the amendment's text, nor was circulation of the initiative petitions a legislative project or act. Thus the Council's drafting of the analysis facilitated no goal or act set or adopted by the legislature.

*Id.* at 589, 886 P.2d at 1345 (footnotes omitted). The Council thus argues that we have disclaimed the power of judicial review of its preparation of analyses for referenda.

¶13 We disagree. As we recognized in *Greene,* judicial review is the only method to ensure that the official publicity pamphlet for ballot proposals complies with the statutory requirements. *Id.* at 590–91, 886 P.2d at 1346–47. The Council's function on initiative and referendum proposals is to assist the people in deciding the issues by providing neutral information while allowing the proponents and opponents of each measure to advocate with arguments that, needless to say, may be anything but neutral expositions. It is not the Council's function to assist either side. *Id.* at 588–89, 886 P.2d at 1344–45. The language quoted from *Greene* simply indicates that we may allow more leeway when the measure in question is one drafted by the Legislature and submitted to the people. *See* Ariz. Const. art. IV, pt. 1, § 1(3). In such cases, the Legislature asks the voters to ratify its measures. The Council, however, is still charged by statute with neutrality. *See* A.R.S. § 19–124(B). In any event, Proposition 300 is not a statute referred by the Legislature for popular ratification. People initiated the referendum, and People's members obtained the signatures of enough voters to have it placed on the general election ballot.

■ ¶14 We therefore conclude that the power of judicial review extends to referenda in general and to Proposition 300 in particular.

## B. Compliance with *Greene*

■ ¶15 Because no evidence was taken by the trial judge, we deal with an issue of law and thus review the trial judge's legal conclusions *de novo. Broemmer v. Abortion Services of Phoenix,* 173 Ariz. 148, 150, 840 P.2d 1013, 1015 (1992); *Tovrea Land & Cattle Co. v. Linsenmeyer,* 100 Ariz. 107, 114, 412 P.2d 47, 51–52 (1966).

■ ¶16 *Greene's* requirement is fairly uncomplicated. We concluded that

the purpose of the required analysis is to assist voters in rationally assessing ... [a] proposal by providing a fair, neutral explanation of the proposal's contents and the changes it would make if adopted....

We hold, therefore, that A.R.S. § 19–124(B) requires the legislative council to produce a neutral explanation of ... proposals, avoiding argument or advocacy, and describing the meaning of the measure, the changes it makes, and its effect if adopted.

180 Ariz. at 590–91, 886 P.2d at 1346–47. Put another way, the language must not mislead, be "tinged with partisan coloring," or argue for one side or the other. *Id.* at 590, 886 P.2d at 1346 (quoting *Plugge v. McCuen,* 310 Ark. 654, 841 S.W.2d 139, 140 (Ark.1992); citing *In re Title, Ballot Title, Submission Clause, and Summary, Adopted August 26, 1991, Pertaining to Proposed Initiative on Education Tax Refund,* 823 P.2d 1353, 1354–55 (Colo.1991)).

■ ¶17 With these principles in mind, we turn to the analysis in question. In doing so, we note that the question is whether reasonable minds could conclude that the Council met the requirements of the law, not whether we believe the judicial system could itself devise a better analysis. *See Priestley v. Paulus,* 287 Or. 141, 597 P.2d 829, 831 (Ore.1979). By their very nature, most disputes over ballot proposals are contentious. Thus, proponents and opponents are often dissatisfied with the Council's analyses. We cannot settle each of these disputes; our function is only to ensure that a challenged analysis is reasonably impartial and fulfills the statutory requirements defined in *Greene.*

384

¶ 18 In challenging the analysis in question, People complains that the Council listed only certain specific drugs other than marijuana and in so doing, picked those most likely to affect the votes of the electorate. In response to the special action petition, People argues that "choice of the phrase 'analogs of PCP' as opposed to 'codeine derivatives' (which could easily have been used instead) or 'heroin' as opposed to ... 'methadone' are clearly fraught with consequences that could affect the votes...." While it is true that the drugs cited in the analysis are those that might affect voters, it is also true that they are Schedule I substances. Thus citing those drugs was neither inaccurate nor inherently misleading. But while the drugs named unquestionably evoke serious concerns in the minds of most people, even if used for medicinal purposes, it is also true that the chemical names of almost all of the other Schedule I substances would have no meaning whatsoever to the overwhelming majority of voters because they are scientifically complex names of chemical compounds unknown to most lay people. As can be seen in footnote 1, to list and explain in easily understandable terms even a few of these substances might make the entire analysis incomprehensible.

¶ 19 Nor would it help voters to simply identify the drugs generically as "those listed on Schedule I" or as "controlled substances." The use of technical, regulatory terms and language is discouraged by A.R.S. § 19–124(B). Use of terms such as "controlled substances," "Schedule I," or the chemical names of the drugs, without examples or explanations, would not fairly apprise the voters of the proposition's contents. The record thus supports the Council's argument that it made a "good faith effort to choose drugs to list in the analysis that the average voter probably can recognize." We note that the Council conducted a public hearing, heard from People's representatives, and made some changes requested by them. On this record, deference must be given to the Council's judgment. Giving due deference, we cannot say that the Council's use of names most easily recognized by voters is, as a matter of law, so overemphasized as to be misleading, inaccurate, lacking in neutrality, or argumentative.

¶ 20 People also complains that omission of the Drug Enforcement Agency as one of the federal agencies that might need to take action before Proposition 200 would become effective is inherently misleading. We do not agree. Again, we think the analysis makes it reasonably clear to the voters that significant federal action would be required before Proposition 200 could become effective.

¶ 21 For the reasons expressed, we also conclude that the descriptive title language used by the Secretary of State on the ballot, together with the "yes/no" formulation, does not violate A.R.S. § 19–125.

## CONCLUSION

¶ 22 We hold that there is subject matter jurisdiction to review the Council's action on the 1998 referendum proposal known as Proposition 300. In reviewing the Council's analysis, we conclude that those substances specifically named are arguably among those most recognizable by the voting public, and the Council's reference to them can reasonably be regarded as an attempt to provide necessary and appropriate information to the voting public. Thus the Council's July 29 analysis substantially complies with the requirements of A.R.S. § 19–124(B). We reach the same conclusion with respect to the Secretary of State's actions under A.R.S. § 19–125(D).

¶ 23 The Secretary of State was therefore authorized to print the publicity pamphlets in accordance with the Council's July 29 analysis and the ballots with the descriptive title and "yes/no" language prepared by the Secretary of State.

McGREGOR, J., and WILLIAM E. DRUKE, Chief Judge, concur.

The Honorable William E. Druke, Chief Judge of Division Two, Arizona Court of Appeals, was designated to sit with the Court pursuant to Arizona Constitution art. VI, § 3.