13 P.3d 1192

HEALTHY ARIZONA INITIATIVE PAC, and Claudia Ellquist, Petitioners,

v.

Jeff GROSCOST, Speaker of the Arizona House of Representatives and Chair of the Legislative Council; Brenda Burns, President of the Arizona Senate and member of the Legislative Council; Rep. Lori Daniels, member of the Legislative Council; Rep. Herschella Horton, member of the Legislative Council; Rep. Marilyn Jarrett, member of the Legislative Council; Rep. John Loredo, member of the Legislative Council; Rep. Robert McLendon, member of the Legislative Council; Rep. Jim Weiers, member of the Legislative Council; Sen. Russell Bowers, member of the Legislative Council; Sen. Jack Brown, member of the Legislative Council; Sen. Chris Cummiskey, member of the Legislative Council; Sen. Ann Day, member of the Legislative Council; Sen. Darden Hamilton, member of the Legislative Council; Sen. Peter Rios, Member of the Legislative Council; Betsey Bayless, Secretary of State; Joint Legislative Budget Staff; all in their official capacity, real parties in interest, Respondents.

No. CV–00–0274–SA.

Supreme Court of Arizona, En Banc.

Dec. 8, 2000.

Raven & Awerkamp PC by Anne C. Graham–Bergin, Tucson, Attorney for Petitioners.

Janet A. Napolitano, Attorney General, Office of the Attorney General by W. Scott Bales, Joseph A. Kanefield, Phoenix, Attorneys for Respondent Bayless.

Gallagher & Kennedy by John E. Lundin, John D. DiTullio, Patrick M. Klein, Phoenix, Attorneys for Respondents Groscost and Burns.

ZLAKET, Chief Justice.

¶ 1 This special action challenges the separate analyses of the Healthy Arizona Initiative–2 prepared by the Arizona Legislative Council and the Joint Legislative Budget Committee staff (JLBC) for inclusion in the Secretary of State's voter information pamphlet. The court considered this case on an expedited basis, without oral argument, and issued its order accepting jurisdiction and granting relief on August 7, 2000. We decided that the third paragraph of the Council's analysis and the second paragraph of the JLBC summary should be deleted or revised to provide an impartial description of the initiative measure. Our order indicated that this opinion would follow.

¶ 2 We need not repeat the jurisdictional basis and legislative background giving rise to this challenge. Today's companion decision, *Citizens for Growth Management v. Groscost*, 199 Ariz. 71, 13 P.3d 1188 (2000), adequately covers those matters. Instead, we turn immediately to the instant claims.

¶ 3 Petitioners argue that the Legislative Council's description of the proposition is not neutral as mandated by Ariz.Rev.Stat. § 19–124(B) (West Supp.1999), which requires "an impartial analysis ... of each ballot proposal of a measure or proposed amendment." We have held that to comply with this statute, the analysis must not mislead. *Citizens for Growth Management*, 199 Ariz. at 74, 13 P.3d at 1191; *Arizona Legislative Council v. Howe*, 192 Ariz. 378, 383, 965 P.2d 770, 775 (1998).

¶ 4 The third paragraph of the Council's explanation states:

It is estimated that annual revenues from the Arizona tobacco litigation settlement fund would be insufficient to cover the cost of this program after July 1, 2003. Supplemental funding from other sources, including the state general fund, would be mandated to ensure that sufficient monies would be available to provide benefits to all eligible persons.

As the petitioners note, this statement does not mention the possibility of federal matching funds to cover future program costs. Granted, there is disagreement about the availability of such funding. Proponents of the ballot measure believe it is probably forthcoming, while opponents take a more conservative view. But the language as drafted, without any reference to potential federal assistance, clearly suggests that *state*

funds other than tobacco settlement monies will be required to meet an inevitable short-fall. We believe this to be misleading in violation of § 19–124(B).

■ ¶ 5 At the same time, the fiscal analysis prepared by the JLBC states:

Proposition 204 allocates monies received from tobacco companies as part of a lawsuit settlement. The state is expected to receive between $92 million and $109 million annually through 2006. By 2025, the state is expected to have received $3.2 billion in total tobacco settlement revenues. Proposition 204 would use these monies to expand eligibility for the Arizona Health Care Cost Containment System (AHCCCS), which is the state's health care system for the poor.

Proposition 204 is projected to have an annual cost of $231 million in 2005 when it is fully phased-in. In addition, the state will save approximately $30 million each year beginning in 2002, as a portion of current AHCCCS costs will be shifted to federal funds. These savings may be used to offset the cost of the program. The tobacco settlement proceeds are projected to be sufficient to cover the costs of Proposition 204 through July 1, 2003 at the latest. Beyond 2003, the tobacco settlement monies will need to be supplemented by other state funding sources unless federal monies are received for the expanded AHCCCS program. Without the federal monies, the state will need to contribute $135 million annually from its general or other revenues by 2005. The prospects of additional federal funding are uncertain due to the cost of the proposal to the federal government.

A second ballot proposition, Healthy Children, Healthy Families (Proposition 200), also fully spends the tobacco settlement. If both initiatives pass, and Healthy Children, Healthy Families receives more votes than this initiative, this initiative would still go into effect. However, the entire projected state cost of the program would need to be paid from its general or other revenues.

While mentioning additional federal funding, this description clearly downplays Arizona's chances of receiving it.

¶ 6 We understand, of course, that any fiscal analysis must be based on reasoned suppositions and predictions. But while the JLBC's complete, *unpublished* analysis spells out the various assumptions on which its conclusions are based, the above summary, designed for publication and distribution to voters, does not. Petitioners claim that some of those assumptions are highly questionable, if not patently incorrect. They argue that instead of providing objective facts upon which voters might weigh the competing views and supporting evidence, the JLBC's written description invariably leads voters to conclude that after 2003, Arizona's taxpayers will have to come up with $135 million annually to fund Healthy Arizona-2.

¶ 7 The reality that future federal resources are not guaranteed does not mean that they are unavailable, nor does it justify the omission of this critical information. Nothing is said in the summary about Arizona's past experience with federal health care funding or the possibility of obtaining future assistance. No attempt is made to explain the JLBC's prediction that prospects "of additional federal funding are uncertain due to the cost of the proposal to the federal government." Without providing the basis for their conclusion, the authors convey the message that Arizona cannot afford the program. Because of this, the fiscal impact summary is not neutral.[1]

¶ 8 We recognize that Ariz.Rev.Stat. § 19–123(D) does not expressly require the JLBC analysis to be impartial. However, the fiscal impact summary appears in the same section

---

1. The dissent notes that "Proposition 204 passed at the general election on November 7, 2000." *Infra* at ¶ 16. That, of course, was not known to us when we decided this matter on August 7, nor is it part of the record in this case. In any event, it does not change our analysis. We are often called upon to make decisions in situations where the eventual outcome is unknown.

The dissent also fears that "[i]f, in the year 2003, federal funds are not available, the people may wonder why they were not told of this contingency." *Infra* at ¶ 17. But that is not the fault of this court. We did nothing to prevent the JLBC or the Legislative Council from redrafting the objectionable paragraphs. In fact, we invited them to do so in our order, but they chose instead to simply delete the offending language.

of the publicity pamphlet as the Legislative Council analysis and is likewise intended to inform voters. It would be anomalous to suggest that only one of the two descriptions must be neutral, especially since a separate section of the pamphlet is set aside for argument and advocacy.

■ ¶ 9 We have previously stated that the legislature may only enact laws that supplement or promote the constitutional right of initiative; it may not unreasonably burden or restrict that right.[2] *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5, 503 P.2d 951, 953 (1972). Permitting a JLBC summary in the official explanation section of the pamphlet without requiring that it be fair and neutral would not serve to protect or foster the initiative process. When viewed against the backdrop of our constitution, Ariz.Rev.Stat. § 19-123 implicitly requires that the JLBC fiscal impact summary, like the Legislative Council's analysis, be impartial.[3]

¶ 10 For these reasons, our order required that the third paragraph of the Legislative Council's analysis and the second paragraph of the JLBC's summary be either deleted or revised to provide an impartial analysis of the initiative measure, free of argument or advocacy.

¶ 11 Petitioners seek attorneys' fees and costs. As explained in *Citizens for Growth Management*, 199 Ariz. at 74, 13 P.3d at 1191, we find that they are entitled to these under Ariz.Rev.Stat. § 12-2030 (West Supp. 1999).

CONCURRING: CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice, RUTH V. McGREGOR, Justice.

2. The constitutional provision states:
[T]he people reserve the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the polls, independently of the Legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any Act, or item, section, or part of any Act, of the Legislature.
Ariz. Const. art. IV, pt. 1, § 1(1) (West Supp. 1999).

3. The dissent does not dispute this. Instead, it constructs a framework in which the Legislative Council and JLBC analyses are "read together" in the search for impartiality. *Infra* at ¶ 13.

MARTONE, Justice, dissenting.

¶ 12 In *Citizens for Growth Management v. Groscost*, No. CV-00-0259-SA (Martone, J., dissenting), I state my dissatisfaction with the majority's dilution of the standards set forth in *Arizona Legislative Council v. Howe*, 192 Ariz. 378, 965 P.2d 770 (1998), in judicially reviewing "impartiality" under A.R.S. § 19-124(B). I do not repeat that here. But this case is a more egregious example of the collapse of our reviewing function. We are doing precisely what we said we would not do in *Howe*, *i.e.*, deciding "whether we believe the judicial system could itself devise a better analysis." 192 Ariz. at 383, 965 P.2d at 775.

¶ 13 The analysis by the Legislative Council is followed directly by the fiscal impact summary in the publicity pamphlet. They are meant to be read together. The majority focuses on what was paragraph three of the Council's analysis and concludes that it is not impartial because it fails to mention the possibility of federal matching funds. But this approach fails to consider the fact that the third paragraph of the Council's analysis was absolutely true. It contains the Council's estimate that the revenues from the tobacco litigation settlement would be insufficient and it notes that supplemental funding from other sources would be required. The reader would then have turned to the fiscal impact summary to see the assumptions upon which the Legislative Council relied. The second paragraph of the fiscal impact summary, when read together with paragraph three of the analysis, creates an integrated whole.

Under this approach, one partisan summary could presumably be neutralized by the other, similar to offsetting penalties in an athletic contest. But nothing in our statutes or case law supports such an interpretation. The two summaries are independent of one another. In fact, when a proposition is referred to the ballot by the legislature, as distinguished from a direct initiative by the people, no JLBC fiscal analysis is required. *See* Ariz.Rev.Stat. § 19-123(A), (D). The Legislative Council's analysis, however, is mandated in both circumstances. *See id.* § 19-123(A)(4). We believe the only reasonable inference is that each must be independently impartial.

The second paragraph of the fiscal impact summary states that supplemental funding would be required after 2003 "unless federal monies are received." It further states that "prospects of additional federal funding are uncertain."

¶ 14 It can be seen that paragraph three of the Council's analysis and paragraph two the fiscal impact summary are designed to put the voter on notice that the initiative is creating a program that is likely to require more funds than those available from the tobacco settlement, and if those funds are not received from the federal government, the state will have to come up with them.

¶ 15 This, I believe, is full disclosure. It is not misleading. Instead, I believe that the majority's removal of paragraph three of the Council's analysis and paragraph two of the fiscal impact summary results in a product that fails to disclose a material contingency. The majority criticizes the fiscal impact summary because "[w]hile mentioning additional federal funding, [it] clearly downplays Arizona's chances of receiving it." *Ante,* at ¶ 5. But there is nothing in paragraph two that downplays Arizona's chances of receiving federal funds. It says "[t]he prospects of additional federal funding are uncertain...." This is the neutrality one would expect in a financial disclosure statement. It contains no opinion, favorable or unfavorable, on the chances of federal funding.

¶ 16 The Legislative Council complied with our order of August 7, 2000, by deleting the third paragraph of its analysis and the second paragraph of the fiscal impact summary. Attached to this dissent is what remained and was published in the Secretary of State's publicity pamphlet. Arizona Secretary of State, *Ballot Propositions and Judicial Performance Review* 160 (Nov. 7, 2000). What is left fails to advise the voter of the possibility that the tobacco settlement fund will be inadequate to fund this new mandate. Proposition 204 passed at the general election on November 7, 2000.

¶ 17 So what have we accomplished? If, in the year 2003, federal funds are not available, the people may wonder why they were not told of this contingency. We could have helped prevent this unhappy prospect and others like it by following the standards we set forth in *Howe,* 192 Ariz. at 383, 965 P.2d at 775. Applying those standards, I would conclude that the Legislative Council's analysis, including paragraph three, and the fiscal impact summary, including paragraph two, *taken as a whole,* are "reasonably impartial." *Id.* I would conclude that "reasonable minds could conclude that the Council met the requirements of the law." *Id.* Thus the Council's "analysis substantially complies with the requirements of A.R.S. § 19–124(B)." *Id.* at 384, 965 P.2d at 776. I therefore respectfully dissent.

## ANALYSIS BY LEGISLATIVE COUNCIL

In 1998, the attorneys general of 46 states, including Arizona, agreed to settle a lawsuit they had filed against the manufacturers of tobacco products. As a result, the tobacco manufacturers must pay each of those states a portion of the estimated $206 billion settlement each year over the next 25 years. Arizona's share is estimated to total approximately $3.2 billion. Payments are subject to annual adjustments for inflation. The settlement also includes a provision to reduce payments if the volume of cigarettes sold in the United States falls. The settlement agreement allows each state to determine how it will spend its share of the settlement.

Proposition 204 would require Arizona to deposit all of the money it receives over the next 25 years from the tobacco litigation settlement in the "Arizona Tobacco Litigation settlement fund." Money in the fund would be used to increase the number of people who are eligible for coverage in the Arizona Health Care Cost Containment System (AHCCCS), which is the state's health care system for the poor. Currently, there are many eligibility categories that determine if a person can receive health care under AHCCCS, including one that requires that a recipient's net income not exceed approximately 34% of the federal poverty level. If Proposition 204 passes, people who earn up to 100% of the federal poverty level will qualify to receive health care under AHCCCS. Future legislatures could change the eligibility requirements to allow more people to qualify to receive health care under AHCCCS but the Legislature and the AHCCCS administration could not reduce or limit the number of persons who would be able to enroll in AHCCCS.

Any excess monies in the Arizona tobacco litigation settlement fund would also be used to ensure that programs that were previously established by the passage of a proposition in the 1996 general election would be fully implemented at funding levels that, when adjusted each year for inflation, would be at least equal to those provided for in that election as follows:

1. Five million dollars for the Healthy Families program, which provides services to prevent child abuse and neglect and to promote child wellness and proper development.

2. Four million dollars for the Arizona Health Education System to provide scholarships to medical students who agree to practice in areas of the state that are currently underserved by health care professionals.

3. Three million dollars for programs to prevent teenage pregnancy.

4. Two million dollars for disease control research.

5. Two million dollars for Health Start, a program that aims to reduce the incidence of low birth weight babies and childhood diseases and to educate families on the importance of good nutrition and preventive health care for their children.

6. One million dollars for the Women, Infants and Children Food program.

Under the 1996 proposition, all of these programs have had to rely on distributions from lottery revenues. However, this has proven to be an insufficient source of funding for these programs.

## Proposition 204 Fiscal Impact Summary

Proposition 204 allocates monies received from tobacco companies as part of a lawsuit settlement. The state is expected to receive between $92 million and $109 million annually through 2006. By 2025, the state is expected to have received $3.2 billion in total tobacco settlement revenues. Proposition 204 would use these monies to expand eligibility for the Arizona Health Care Cost Containment System (AHCCCS), which is the state's health care system for the poor.

A second ballot proposition, Healthy Children, Healthy Families (Proposition 200), also fully spends the tobacco settlement. If both initiatives pass, and Healthy Children, Healthy Families receives more votes than this initiative, this initiative would still go into effect. However, the entire projected state cost of the program would need to be paid from its general or other revenues.

---

Spelling, grammar, and punctuation were reproduced as submitted in the "for" and "against" arguments.