IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**ARIZONA FOR ABORTION ACCESS,**
*Plaintiff/Appellee,*

*v.*

**STEVE MONTENEGRO, ET AL.,\***
*Defendants/Appellants.*

No. CV-24-0167-AP/EL
**Filed April 3, 2025**

Appeal from the Superior Court in Maricopa County
The Honorable Christopher T. Whitten, Judge
No. CV2024-017968
**REVERSED**

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Kara Karlson, Senior Litigation Counsel, Karen J. Hartman-Tellez, Senior Litigation Counsel, Kyle Cummings, Assistant Attorney General, Phoenix, Attorneys for Adrian Fontes

Kory Langhofer, Thomas Basile, Statecraft, Phoenix, Attorneys for Steve Montenegro, Warren Petersen, Shawnna Bolick, Sonny Borrelli, Sine Kerr, Travis Grantham, Teresa Martinez, and Quang Nguyen

---

\* Pursuant to Arizona Rule of Civil Appellate Procedure 27(c)(2), the name of Defendant/Appellant has been changed from Ben Toma, in his official capacity as Speaker and member of the House of Representatives for the State of Arizona, to Steve Montenegro, in his official capacity as Speaker and member of the House of Representatives for the State of Arizona.

D. Andrew Gaona, Austin C. Yost, Andrew T. Fox, Malvika A. Sinha, Coppersmith Brockelman PLC, Phoenix, Attorneys for Arizona for Abortion Access

Rhonda L. Barnes, Arizona House of Representatives, Phoenix, Attorney for Lupe Contreras, Nancy Gutierrez, and Stephanie Stahl Hamilton

Elizabeth Higgins, Arizona Senate, Phoenix, Attorney for Mitzi Epstein, Brian Fernandez, and Juan Mendez

Joshua D. Bendor, Alexander W. Samuels, Luci D. Davis, Office of the Attorney General, Phoenix, Attorneys for Amicus Curiae Kristin K. Mayes

Nathan J. Fidel, Miller, Pitt, Feldman & McAnally P.C., Phoenix; James Patrick Davy, All Rise Trial & Appellate, Philadelphia, PA; Joshua A. Rosenthal, Jordan Phillips, Public Rights Project, Oakland, CA, Attorneys for Amici Curiae Sara Benatar, Steve Gallardo, Alma Hernandez, Consuelo Hernandez, Cheryl Mango-Paget, Regina Romero, and Debra Stark

———————————

JUSTICE KING authored the Opinion of the Court, in which VICE CHIEF JUSTICE LOPEZ and JUSTICES BRUTINEL (RETIRED) and PELANDER (RETIRED) joined.** JUSTICE MONTGOMERY authored a concurring opinion. CHIEF JUSTICE TIMMER authored a dissenting opinion, in which JUSTICE BEENE joined.

———————————

** Justice Brutinel participated in the decision order that was issued in this case on August 14, 2024. He retired before this Opinion was issued, but nevertheless participated in deciding the case and joined in this Opinion. Justice Clint Bolick has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

JUSTICE KING, Opinion of the Court:

¶1 The Secretary of State is required to prepare a publicity pamphlet that is mailed to every household that has a registered voter before a general election. A.R.S. § 19-123(A), (B). The publicity pamphlet contains information about any measure or proposed amendment to the Arizona Constitution on the ballot, including an analysis of each ballot proposal prepared by the Legislative Council ("Council"). § 19-123(A)(1)–(4). The Council must prepare "an impartial analysis of the provisions of each ballot proposal of a measure or proposed amendment." A.R.S. § 19-124(C). This "analysis shall include a description of the measure and shall be written in clear and concise terms avoiding technical terms wherever possible. The analysis may contain background information, including the effect of the measure on existing law." *Id.*

¶2 The Council approved an analysis ("Analysis") for the Arizona Abortion Access Act Initiative I-05-2024 ("Initiative"), which appeared on the November 5, 2024 general election ballot. The Analysis began with an accurate description of existing law: "Current state law prohibits a physician from performing an abortion if the probable gestational age of the unborn human being is more than 15 weeks, except when a pregnant woman's medical condition necessitates an immediate abortion to avert the pregnant woman's death or for which a delay creates a serious risk of substantial and irreversible impairment of a major bodily function." *See* A.R.S. § 36-2322. The Analysis then described how the Initiative would amend the Arizona Constitution, including an express statement that every individual has a fundamental right to abortion and a prohibition on certain state action with respect to abortion that adds the terms "fetus" and "fetal" into the Arizona Constitution.

¶3 The proponent of the Initiative claims the Analysis violates § 19-124(C)'s impartiality requirement because "unborn human being" is used when describing existing law and requests that "fetus" be used instead. After considering the briefs and authorities filed by the parties and amici, we issued a decision order on August 14, 2024, concluding that the Analysis provides the information required by § 19-124(C) and substantially complies with the statute's impartiality requirement. *See Tobin v. Rea*, 231 Ariz. 189, 193 ¶ 11 (2013); *Ariz. Legis. Council v. Howe*, 192 Ariz. 378, 384 ¶ 22 (1998). We reversed the superior court's ruling that the

3

inclusion of "unborn human being" in the Analysis violates § 19-124(C) and now explain our reasoning.[1]

## BACKGROUND

¶4　　　Section 36-2322 sets forth a gestational limit on abortions. Subsection (A) provides: "Except in a medical emergency, a physician may not perform, induce or attempt to perform or induce an abortion unless the physician or the referring physician has first made a determination of the probable gestational age of the *unborn human being* and documented that gestational age in the maternal patient's chart." § 36-2322(A) (emphasis added). Subsection (B) provides: "Except in a medical emergency, a physician may not intentionally or knowingly perform, induce or attempt to perform or induce an abortion if the probable gestational age of the *unborn human being* has been determined to be greater than fifteen weeks." § 36-2322(B) (emphasis added).

¶5　　　Arizona for Abortion Access ("Committee") is the political action committee that sponsored the Initiative. The Initiative proposes adding a new section 8.1 to article 2 of the Arizona Constitution. The text of the proposed constitutional amendment states in relevant part:

> A. Every individual has a fundamental right to abortion, and the state shall not enact, adopt or enforce any law, regulation, policy or practice that does any of the following:
>
> 1. Denies, restricts or interferes with that right before *fetal viability* unless justified by a compelling state interest that is achieved by the least restrictive means.
>
> 2. Denies, restricts or interferes with an abortion after *fetal viability* that, in the good faith judgment of a treating health care professional, is necessary to protect the life or physical or mental health of the pregnant individual.
> . . . .

---

[1] The Arizona electorate approved the Initiative at the November 5, 2024 general election.

4

> B. For the purposes of this section,
>
> . . . .
>
> 2. '*Fetal viability*' means the point in pregnancy when, in the good faith judgment of a treating health care professional and based on the particular facts of the case, there is a significant likelihood of the *fetus's* sustained survival outside the uterus without the application of extraordinary medical measures.

(Emphasis added.) Thus, the Initiative is not limited to abortions pre-viability. The Initiative addresses abortions at all stages of a pregnancy.

¶6 On July 8, 2024, the Council held a public meeting to discuss a draft analysis prepared by Council staff, consider any proposed amendments, and approve the final analysis. The draft analysis stated:

> *Current state law* prohibits a physician from performing an abortion if the probable gestational age of the *unborn human being* is more than 15 weeks, except when a pregnant woman's medical condition necessitates an immediate abortion to avert the pregnant woman's death or for which a delay creates a serious risk of substantial and irreversible impairment of a major bodily function.
>
> Proposition ___ *would amend the Arizona Constitution to*:
>
> 1. Expressly state that every individual has a fundamental right to abortion.
>
> 2. Prohibit this state, any agency of this state or any political subdivision of this state from enacting, adopting or enforcing any law, regulation, policy or practice that would do any of the following:
>
> (a) Deny, restrict or interfere with the fundamental right to abortion before *fetal viability* (the point in pregnancy when, in the good faith judgment of a treating health care professional and based on the particular facts of the case, there is a significant likelihood of the *fetus's* sustained survival outside

5

the uterus without the use of extraordinary medical measures) unless justified by a compelling state interest that is achieved by the least restrictive means. The measure defines 'compelling state interest' as a law, regulation, policy or practice that is enacted or adopted for the limited purpose of improving or maintaining the health of an individual seeking an abortion consistent with clinical practice standards and evidence-based medicine and that does not infringe on that individual's autonomous decision-making.

(b) Deny, restrict or interfere with an abortion after *fetal viability* that, in the good faith judgment of a treating health care professional, is necessary to protect the life or physical or mental health of the pregnant individual.

(c) Penalize any individual or entity for aiding or assisting a pregnant individual in exercising the pregnant individual's right to abortion as provided in the measure.

(Emphasis added.)

¶7    As noted, when describing current state law, the draft analysis used the precise term found in § 36-2322: "unborn human being." At the meeting, the Committee requested that the Council replace "unborn human being" with "fetus," arguing that "in the reproductive rights context, the phrase 'unborn human being' is tinged with partisan coloring." The Committee claimed that "fetus" is the neutral, objective, and medically accepted term. A majority of the Council rejected the Committee's proposed amendment and voted to adopt the draft analysis without amendment.

¶8    The Committee filed a complaint in superior court, alleging that inclusion of "unborn human being" in the Analysis violated the impartiality requirement in § 19-124(C). The superior court conducted an evidentiary hearing and trial on the merits, in which the court heard argument from both parties, examined admitted documents, and considered testimony from the Committee's witness, Dr. Patricia Habak, a board-certified obstetrician-gynecologist. The court concluded that the Analysis failed to comply with § 19-124(C) because "[t]he term 'unborn

6

human being' is packed with emotional and partisan meaning, both for those who oppose abortion and for those who endorse a woman's right to choose whether to have an abortion." The court granted relief to the Committee and ordered the Council "to strike the phrase 'unborn human being' from its description of the Arizona Abortion Access Act and, instead, adopt an impartial summary of the Initiative that replaces that phrase with a neutral term which complies with A.R.S. § 19-124(C)."

¶9 Several members of the Council challenged the superior court's order in this Court by filing an expedited election appeal, which this Court treated as a special action. Those members were Speaker of the Arizona House of Representatives Ben Toma, President of the Arizona State Senate Warren Petersen, Senators Shawnna Bolick, Sonny Borrelli, and Sine Kerr, and Representatives Travis Grantham, Teresa Martinez, and Quang Nguyen (collectively "Appellants"). We accepted special action jurisdiction because there was no equally plain, speedy, and adequate remedy by appeal given the time constraints for printing and mailing the publicity pamphlet. *See Tobin*, 231 Ariz. at 193 ¶ 8; *see also Howe*, 192 Ariz. at 382 ¶ 10.

## DISCUSSION

¶10 Whether the Council prepared an "impartial analysis" under § 19-124(C) is an issue of law that we review de novo. *See Voice of Surprise v. Hall*, 255 Ariz. 510, 513 ¶ 11 (2023) ("We review the interpretation and application of statutes de novo as issues of law."). Special action relief is appropriate if the superior court's ruling is arbitrary, capricious, or an abuse of discretion. *Tobin*, 231 Ariz. at 194 ¶ 14. "Misapplication of law or legal principles constitutes an abuse of discretion." *Id.*

### A. The Council Must Prepare An "Impartial Analysis" Of A Proposed Measure Or Constitutional Amendment.

¶11 The Council is a statutory agency, established under Arizona Revised Statutes title 41, chapter 8 ("Agencies of the Legislative Department"). *See Fairness & Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 588 (1994). The Council "acts in an administrative or ministerial role, rather than in any legislative capacity, in fulfilling its legislatively imposed duty to prepare and file with the secretary of state an impartial

analysis of initiative proposals." *Id.* at 588–89. In *Greene*, this Court held that whether the Council carried out its statutory responsibility to prepare an impartial analysis is subject to judicial review and an issue over which this Court has jurisdiction. *Id.* at 590. Appellants argue that "[w]hether the words of the law conform to some external paradigm of 'impartiality' is not a question the judiciary can answer," but they do not ask us to overrule *Greene*.

¶12 "The Council's function on initiative . . . proposals is to assist the people in deciding the issues by providing neutral information while allowing the proponents and opponents of each measure to advocate with arguments that . . . may be anything but neutral expositions. It is not the Council's function to assist either side." *Howe*, 192 Ariz. at 383 ¶ 13. Indeed, people may file arguments for or against the adoption of a ballot proposal that appear separately in the publicity pamphlet. *See* § 19-123(A)(3) (providing that publicity pamphlet shall contain "arguments for and against the measure or amendment"); § 19-124(A) (allowing persons to file with the secretary of state "argument[s] advocating or opposing the measure or constitutional amendment"); § 19-124(D) ("The analyses and arguments shall be included in the publicity pamphlet immediately following the measure or amendment to which they refer.").

¶13 "[T]he purpose of the required analysis is to assist voters in rationally assessing an initiative proposal by providing a fair, neutral explanation of the proposal's contents and the changes it would make if adopted." *Greene*, 180 Ariz. at 590. Section 19-124(C) requires the Council to "produce a neutral explanation of initiative proposals, avoiding argument or advocacy, and describing the meaning of the measure, the changes it makes, and its effect if adopted." *Id.* at 591. "The analysis and description must eschew advocacy—argument—for or against the proposal's adoption." *Id.* at 590. Likewise, the language "must be free from any misleading tendency, whether of amplification, of omission, or of fallacy, and it must not be tinged with partisan coloring." *Id.* (quoting *Plugge v. McCuen*, 841 S.W.2d 139, 140 (Ark. 1992)); *see also Citizens for Growth Mgmt. v. Groscost* ("*CGM*"), 199 Ariz. 71, 72 ¶ 4 (2000); *Howe*, 192 Ariz. at 383 ¶ 13.

¶14 This Court reviews an analysis for "substantial compliance" with § 19-124(C)'s impartiality requirement. *Tobin*, 231 Ariz. at 193 ¶ 11.

"[T]he question is whether reasonable minds could conclude that the Council met the requirements of the law, not whether we believe the judicial system could itself devise a better analysis." *Howe*, 192 Ariz. at 383 ¶ 17. "By their very nature, most disputes over ballot proposals are contentious. Thus, proponents and opponents are often dissatisfied with the Council's analyses. We cannot settle each of these disputes; our function is only to ensure that a challenged analysis is reasonably impartial and fulfills the statutory requirements." *Id.*

**B. The Analysis Substantially Complies With § 19-124(C)'s Impartiality Requirement.**

**¶15** The Analysis begins with a description of "current state law" and then describes how the Initiative "would amend the Arizona Constitution." The Committee does not claim that the Council's description of the Initiative itself is partial. There is no allegation that the description of the Initiative's provisions is inaccurate, incomplete, misleading, or tinged with partisan coloring. *See* § 19-124(C) (stating the Council shall prepare "an impartial analysis of the provisions of each ballot proposal of a measure or proposed amendment").

**¶16** Instead, the Committee contends that the Council's inclusion of "unborn human being" when describing current state law violates the impartiality requirement in § 19-124(C). On this point, however, it is undisputed that the Analysis accurately describes existing law. *See* § 36-2322 (using "unborn human being" when identifying when and under what circumstances an abortion may be performed).

1. <u>Arizona Supreme Court Precedent Regarding An "Impartial Analysis"</u>

**¶17** We are not writing on a clean slate. This Court has previously decided challenges arising from the Council's obligation to prepare an impartial analysis. But this Court has never found that an analysis violated the impartiality requirement where, as here, the Council used precise statutory language to describe existing law and then explained the text of the proposed measure and its effects. Instead, this Court has concluded that analyses were not impartial where they departed from or inaccurately described the text of existing law or the proposed measure or

9

failed to include relevant contextual information. *See Greene*, 180 Ariz. 582; *CGM*, 199 Ariz. 71; *Tobin*, 231 Ariz. 189.

**¶18** In *Greene*, this Court concluded that the Council's analysis failed to comply with the impartiality requirement because it departed from the text of existing law and the initiative in several ways. 180 Ariz. at 591–92. The initiative there sought to amend Arizona's constitutional provisions that (1) prohibit the enactment of laws that limit the amount of damages for death or personal injury, (2) prohibit laws that abrogate the right of action to recover damages for injuries, and (3) provide that the defense of contributory negligence or assumption of the risk is a question of fact for the jury. *Id.* at 584, 591 (citing Ariz. Const. art. 2, § 31; *id.* art. 18, §§ 5–6)). The analysis stated:

> The Arizona Constitution, enacted in 1912, prohibits the people and their elected representatives from controlling what kinds of civil lawsuits are brought into the courts and how they are prosecuted. It also prohibits the people and their elected representatives from limiting the amount of compensation awarded during such lawsuits.
>
> This proposition amends the Arizona Constitution to allow people or their elected representatives to control: 1) the filing and prosecution of civil lawsuits for personal injury and wrongful death; 2) the amount of compensation awarded during those lawsuits.

*Id.* at 591.

**¶19** This Court determined that the analysis in *Greene* "understate[d] the power already vested in the legislature and the people, as well as the additional powers the amendment would create." *Id.* The analysis also incorrectly "implie[d] that Arizonans and their legislature presently cannot control civil actions in any way." *Id.* As this Court explained, the relevant constitutional provisions apply only to actions for death and injury—not to all "civil lawsuits." *Id.* And while the Arizona Constitution prohibits abrogation of the right of action to recover damages for injuries, it does not preclude all statutory regulation or control of civil lawsuits. *Id.* at 591–92.

¶20 Moreover, the assertion that the initiative would amend the Arizona Constitution to allow people to control civil lawsuits and damage awards "crosse[d] well past the blurry line between impartiality and advocacy" because the "people themselves already have the ability to control, and even abolish, civil actions and damages." *Id.* at 592. "A disinterested analysis would not suggest the creation of a power that already exists." *Id.*

¶21 Further, the initiative did more than simply allow the legislature to "control" civil lawsuits and compensation—it permitted "the legislature to entirely abolish causes of action for injury." *Id.* "The adopted analysis subjectively minimize[d] this important effect." *Id.*

¶22 The analysis in *Greene* also made "no reference at all to an important provision of the initiative" concerning contributory negligence and assumption of risk. *Id.* at 591–92. If "an initiative amends a small number of distinct constitutional provisions, an impartial analysis and description must include some reference to each of the affected provisions." *Id.* at 592. The analysis, therefore, was not impartial. *Id.*

¶23 Next, in *CGM*, this Court concluded that an analysis was not impartial where the Council injected descriptive language that was not in the text of existing law to suggest that the initiative was unnecessary because existing law already provided the appropriate amount of regulation. 199 Ariz. at 72–73 ¶¶ 6–8. The first two sentences of the analysis stated that "Arizona cities, towns and counties currently have *extensive* authority to regulate development and land uses" and their "local planning powers have been *expanded* by new laws passed" just recently. *Id.* at 72 ¶ 5 (emphasis added). The analysis then set forth the changes purportedly made by those new laws. *Id.*

¶24 By including "extensive" and "expanded," the analysis attempted "to persuade the reader at the very outset that present laws adequately address the perceived problems the initiative [sought] to remedy," and this was a "rhetorical strategy" that was not impartial. *Id.* at 72–73 ¶ 6. Also, use of "extensive" — a term not in the statutory text — to describe the authority of cities, towns, and counties to regulate land use had a "partisan connotation[]" in the context of Arizona's heated debate about

11

growth. *Id.* at 73 ¶ 7. Further, the analysis stated that "present law 'require[s] the development of comprehensive growth management plans'"—but "nothing like the term 'comprehensive growth management plan' is used in the . . . legislation, which merely continues the use of 'general plans' in dealing with growth-related matters." *Id.* ¶ 8 (first alteration in original). Because the analysis contained descriptive language that departed from the text and meaning of existing law, this Court concluded it was not impartial. *Id.* at 72–73 ¶¶ 6–8, 74 ¶ 13.

**¶25** Finally, in *Tobin*, the first paragraph of the analysis described the initiative as imposing a "tax increase" several times but omitted relevant contextual information about the fact that the initiative's proposed new tax increase was "equivalent in amount to the current, temporary tax increase and would take effect only when the latter expires." 231 Ariz. at 195 ¶ 18. That contextual information was necessary to provide voters with a complete understanding of the initiative as it related to existing tax laws. *See id.* "Without providing any such explanatory context, the Council's repeated reference to a 'tax increase' in the first paragraph of the analysis 'attempt[ed] to persuade the reader at the very outset' that the initiative [was] contrary to his or her financial interests." *Id.* (quoting *CGM*, 199 Ariz. at 72 ¶ 6).

**¶26** In addition, the analysis in *Tobin* "misleadingly suggested the [initiative] would more broadly limit tax base adjustments" and "that the legislature may never adjust the sales tax base or reduce Arizona's sales tax." *Id.* at 195 ¶ 22, 196 ¶ 26. The analysis failed to accurately explain "the initiative's qualified limitation on adjustment of the sales tax base. Rather, the analysis overstate[d] that limitation and, therefore, tend[ed] to mislead." *Id.* at 196 ¶ 27.

**¶27** Moreover, the analysis stated that the proposition did not define who qualified as a "resident" for purposes of the student scholarships, but it did not mention that many of the initiative's other terms were undefined. *Id.* ¶ 29. In doing so, "the Council selectively emphasized that the initiative [did] not define 'resident' for student scholarship purposes and referred to that omission as a 'fail[ure],' thereby suggesting that the initiative [was] flawed in that respect." *Id.* at 197 ¶ 32 (second alteration in original). The statement also overlooked "several

Arizona statutes that, at least implicitly, suggest that illegal immigrants would not qualify as 'resident students' for scholarship purposes."   *Id.*

**¶28**          The case before us significantly differs from *Greene*, *CGM*, and *Tobin*.   The reference to "unborn human being" when describing "[c]urrent state law" does not depart from or inaccurately describe the text of existing law or the proposed measure; does not misrepresent or create misleading interpretations about the text of existing law or the proposed measure; does not contain extraneous adjectives, adverbs, or commentary chosen by the Council; does not omit relevant contextual information; and does not selectively emphasize one omission in the initiative to the exclusion of others.   In this case, the Council recited the precise term used in existing law to illustrate the changes the Initiative would make if adopted.

2. <u>The Committee's Request For "Fetus" To Replace "Unborn Human Being"</u>

**¶29**          At the Council's meeting and throughout this case, the Committee has argued that "fetus" should be used in place of "unborn human being" in the Analysis.   But we cannot overlook the fact that the dictionary definition of "fetus" is a human that is unborn.   *Fetus*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fetus#medicalDictionary (last visited Mar. 27, 2025) (defining "fetus" as "an *unborn* or unhatched vertebrate especially after attaining the basic structural plan of its kind . . . specifically: a developing *human* from usually two months after conception to birth") (emphasis added); *see also Fetus*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/fetus (last visited Mar. 27, 2025) (defining "fetus" as "a young *human being* or animal *before birth*, after the organs have started to develop") (emphasis added). This alignment with the ordinary meaning of these terms is relevant to our impartiality analysis.   *See In re Drummond*, 257 Ariz. 15, 18 ¶ 7 (2024) (stating that "courts generally give words their ordinary meaning and may look to dictionary definitions").

> a. *Section 19-124(C) Directs That Technical Terms Shall Be Avoided Wherever Possible.*

**¶30** The Committee argues that the Council's use of "unborn human being" is improper because "fetus" is the medically accepted term. But the standard in § 19-124(C) is not whether a term is "medically accepted" by trained medical providers. Instead, § 19-124(C) specifically directs that "[t]he analysis . . . shall be written in clear and concise terms *avoiding technical terms wherever possible*." (Emphasis added.) *See Howe*, 192 Ariz. at 384 ¶ 19 (explaining that "use of technical, regulatory terms and language is discouraged" and citing "controlled substances," "Schedule I," and "the chemical names of the drugs, without examples or explanations" as examples of such technical, regulatory terms). "Fetus" has a medical definition that applies during a particular stage of the pregnancy. *Fetus*, Dorland's Illustrated Medical Dictionary 683 (33d ed. 2020) (defining "fetus" as "the unborn offspring of any viviparous animal; specifically, the unborn offspring in the postembryonic period, after major structures have been outlined, in humans from nine weeks after fertilization until birth. Cf. *embryo*."); *cf. id.* at 600 (defining "embryo" as "in humans, the developing organism from fertilization to the end of the eighth week. Cf. *fetus*.").

**¶31** Section 19-124(C)'s direction that non-technical terms be used in place of technical terms wherever possible makes sense because voters are then more likely to understand and rationally assess a proposed measure. Two examples in the medical context demonstrate this point. The phrase "myocardial infarction" is a medical term, but the non-technical understanding of that term is "heart attack." *Heart Attack*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/heart%20attack (last visited Mar. 27, 2025); *Myocardial Infarction*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/myocardial%20infarction (last visited Mar. 27, 2025). Similarly, "edema" is a medical term, but it is more commonly understood as "swelling." *Swelling*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/swelling (last visited Mar. 27, 2025); *Edema*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/edema#medicalDictionary (last visited Mar. 27, 2025). An analysis of a health-related measure intended to improve public health and reduce the rate of deaths caused by "myocardial infarction" would more readily be understood by voters if it

was described as a "heart attack" death reduction proposal.   Put simply, § 19-124(C) recognizes that the use of non-technical terms where possible is more likely to assist voters with understanding and rationally assessing a proposed measure, in particular with voters who lack specialized training or expertise in a technical area.

¶32        The Committee presented testimony from Dr. Habak in an effort to support its claim that "fetus" is the medically accepted term.   Dr. Habak testified that based on her medical experience and training, "fetus" is a medically accepted term and "unborn human being" is not, and her testimony is consistent with the policy and position statements of the American College of Obstetricians and Gynecologists ("ACOG").

¶33        But Dr. Habak also acknowledged situations in the patient care context in which she might hear variations of "unborn human being," like "unborn child," or use the phrase herself.   She also testified that she did not search medical literature for use of the term "unborn human being" in preparing for her testimony; she is aware that "unborn human being" has appeared in some medical publications; she does not think the ACOG policy (that "unborn human being" is not medically accepted) uses that specific terminology in writing anywhere; there are situations where someone might possibly use the term "unborn human being"; and the term "unborn human being" has been used "when the audience is a group of patients who are further along in pregnancy and have more of a thought of what they should be doing during pregnancy with respect to the outcome of a baby that's going to be delivered."   Accordingly, Dr. Habak's testimony does not support a conclusion that the use of "unborn human being" violates § 19-124(C)'s impartiality requirement.   In fact, it illustrates the technical nature of the term "fetus."

> b. *Section 19-124(C) Provides That The Analysis May Contain Background Information, Including The Effect of A Measure On Existing Law.*

¶34        Section 19-124(C) further specifies that the "analysis may contain background information, including the effect of the measure on existing law."   *See Greene*, 180 Ariz. at 590 (noting that, with respect to the proposal, the analysis should provide "the changes it would make if adopted").   And that is precisely what the Analysis does here.

¶35        The phrase "unborn human being" appears four times in the relevant existing law, § 36-2322.   *See, e.g.*, § 36-2322(B) ("Except in a medical emergency, a physician may not intentionally or knowingly perform, induce or attempt to perform or induce an abortion if the probable gestational age of the unborn human being has been determined to be greater than fifteen weeks.").   "Human being" is also defined in statute as "an individual member of the species homo sapiens, from and after the point of conception."   A.R.S. § 36-2321(5).

¶36        The Analysis contains the precise terminology—"unborn human being"—that is used in § 36-2322's declaration about when a physician may not perform an abortion under existing statutory law (i.e., when "the probable gestational age of the unborn human being has been determined to be greater than fifteen weeks," except in a medical emergency).    The Analysis then uses the Initiative's precise terminology—"fetus" and "fetal"—when describing the prohibition on state action that denies, restricts, or interferes with an abortion under the Arizona Constitution if the measure passes.   By accurately noting that existing statutory law describes a pregnancy as involving an "unborn human being," and then identifying that the Initiative proposes adding the terms "fetus" and "fetal" into the Arizona Constitution when creating "a fundamental right to abortion," the Analysis provides background information about existing law and the measure's proposed changes.   *See* § 19-124(C).   This approach impartially puts voters on notice of exactly what they are voting for or against.

¶37        Stated otherwise, voting in favor of the Initiative supports adding "fetus" and "fetal" into the Arizona Constitution in the context of abortion.   Voting against the Initiative rejects adding those terms for the first time to the Arizona Constitution.   Certain voters may find the existing statutory law's reference to "unborn human being" and the Initiative's reference to "fetus" and "fetal" important enough to tip the scale in favor of voting for or against the Initiative.   In other words, a voter may prefer the term "unborn human being" over "fetus" (or vice versa).   And the record here supports this very point.   During public comment at the Council's July 8, 2024 meeting, one individual publicly expressed that she supported the term "unborn human" over "fetus."   Using the precise terminology that appears in existing statutory law and the precise

16

terminology in the proposed constitutional measure "can reasonably be regarded as an attempt to provide necessary and appropriate information to the voting public." *Howe*, 192 Ariz. at 384 ¶ 22.

¶38 The parties stipulated that "[p]ro-abortion advocates generally use the term 'fetus' in their advocacy," while "groups that generally oppose abortion . . . use terms like 'unborn children,' 'unborn babies,' and 'preborn baby.'" By requesting that "fetus" replace "unborn human being" in the Analysis, the Committee purportedly believes that "fetus" will provide the Committee an advantage at the polls. But "[i]t is not the Council's function to assist either side." *Howe*, 192 Ariz. at 383 ¶ 13.

> c. *The Committee's Out-Of-State Cases And Other Arguments Do Not Support A Conclusion That The Council Failed To Substantially Comply With § 19-124(C).*

¶39 The Committee cites out-of-state cases where courts have discussed terminology similar to "unborn human being" in proceedings dealing with legal issues that are materially different from the issue before us.

¶40 First, in *Margaret S. v. Treen*, 597 F. Supp. 636, 642 (E.D. La. 1984), plaintiff sought to prevent operation of certain Louisiana abortion statutes, in part based on *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). In addressing an informed consent issue, the court determined that although one statute uses the term "unborn child," the statute "does not specifically mandate the use of this terminology in the consent form provided to the abortion patient." *Margaret S.*, 597 F. Supp. at 661. Thus, other terms may be used in referring to the "unborn child" in consent forms, including "fetus" or "conceptus." *Id.* The court then stated in dicta, "[t]he evidence adduced at trial established that these are medically accepted terms, unlike the term 'unborn child,' which could increase a woman's guilt surrounding the abortion decision by implying that she is taking the life of a person." *Id.* In support of this sentence, *Margaret S.* cited *Roe*, which has been overruled, and *Poe v. Gerstein*, 517 F.2d 787 (5th Cir. 1975), which the Eleventh Circuit recently recognized was abrogated by *Dobbs* in *SisterSong Women of Color*

*Reproductive Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1326 (11th Cir. 2022). *See Margaret S.*, 597 F. Supp. at 661 n.21. Moreover, as discussed, whether "fetus" is the medically accepted term is not the applicable standard in § 19-124(C).

¶41 Second, *Acuna v. Turkish*, 930 A.2d 416, 418 (N.J. 2007) was a medical malpractice action. The plaintiff claimed that she did not give the physician informed consent to terminate her pregnancy, alleging he "breached a duty owed to her by failing to inform her of 'the scientific and medical fact that [her six- to eight-week-old embryo] was a complete, separate, unique and irreplaceable human being' and that an abortion would result in 'killing an existing human being.'" *Id.* (alteration in original). The court determined that New Jersey common law does not command that a physician inform a pregnant mother "that an embryo is an existing, living human being and that an abortion results in the killing of a family member." *Id.* at 428. In concluding that such a duty does not exist, the court explained "there is no consensus in the medical community or society supporting plaintiff's position that a six- to eight-week-old embryo is, as a matter of biological fact—as opposed to a moral, theological, or philosophical judgment—'a complete, separate, unique and irreplaceable human being' or that terminating an early pregnancy involves 'actually killing an existing human being.'" *Id.* at 425–26. The court's analysis relied in part on *Roe* and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which were both overruled by *Dobbs*. *Acuna*, 930 A.2d at 426.

¶42 The Committee also cites *Casey*, in which Justice Scalia concurred in part and dissented in part. 505 U.S. at 979. In explaining his disagreement with *Roe* and the majority's opinion in *Casey*, Justice Scalia stated:

> The whole argument of abortion opponents is that what the Court calls the fetus and what others call the unborn child *is a human life*. Thus, whatever answer *Roe* came up with after conducting its 'balancing' is bound to be wrong, unless it is correct that the human fetus is in some critical sense merely potentially human. There is of course no way to determine that as a legal matter; it is in fact a value judgment. Some

societies have considered newborn children not yet human or
the incompetent elderly no longer so.

*Id.* at 982. As Justice Scalia acknowledged, some people prefer the term
"fetus" and others prefer "unborn child." *Id.* And that supports our
point here: It is up to the informed voters of Arizona—not this Court in its
impartiality analysis—to decide which terminology is preferred in Arizona
law.

**¶43** The Committee's cited cases address legal issues that are
materially different from the issue before us, are based on state laws that
differ from the specific framework in § 19-124(C), and rely on precedent
that has since been overruled. We further note that other courts have used
terminology like that found in the Analysis. *See Gonzalez v. Carhart*, 550
U.S. 124, 134 (2007) ("Abortion methods vary depending to some extent on
the preferences of the physician and, of course, on the term of the pregnancy
and the resulting stage of the unborn child's development."); *State v. Cotton*,
197 Ariz. 584, 588 ¶ 15 (App. 2000) ("By its terms, the fetal manslaughter
statute applies only to the killing of an *unborn* child. It reflects a legislative
decision to afford protection to unborn children that was not available
under traditional homicide statutes because of the common law born alive
rule."). The Committee's cited cases do not support a conclusion that the
Analysis was partial under § 19-124(C).

**¶44** The Committee also directs our attention to Speaker Toma's
comments, at the July 8, 2024 meeting, that he believed using both terms
("unborn human being" and "fetus") is a fair and balanced approach in the
aggregate to deal with two terms that he believed are partial depending on
one's personal views about abortion. As the Committee correctly points
out, this Court has rejected "a whole-is-greater-than-the-sum-of-its-parts
theory" which would allow "finding the entire analysis impartial even
though certain sentences or paragraphs are not." *CGM*, 199 Ariz. at 73
¶ 11. But as discussed, the Council impartially followed both relevant
texts by reciting the precise terminology in existing law and the precise
terminology in the proposed measure. Speaker Toma's thought process
about why he believed the Analysis would be impartial does not affect the
statutory inquiry before us.

¶45        Finally, as discussed, people may file arguments for or against the adoption of a ballot proposal that appear separately from the analysis in the publicity pamphlet.   To that end, whether Arizona voters should (1) support the Initiative that will create "a fundamental right to abortion" and add the terms "fetus" and "fetal" to the Arizona Constitution for the first time, or alternatively (2) reject the Initiative in favor of existing statutory law that refers to "unborn human being," is a point that can be debated in the arguments section of the publicity pamphlet.   People may submit arguments, for example, that the term "fetus" is a medically accepted term that should be in the Arizona Constitution in the context of abortion.

**C.   The Court's Role Is To Ensure That Voters Are Informed Of The Current Law And How A Proposed Measure Would Change The Law Without Partisan Coloring Or Advocacy.**

¶46        At bottom, the Committee seeks to judicially censor a statutory phrase from a voter publication that it contends is packed with emotional and partisan meaning.   But how exactly does a judge decide whether one term is too emotional for the public to view and rationally assess?   And how does a judge determine whether an overall issue, let alone one term, is too controversial?   The Committee has not suggested a judicially manageable standard for doing so, even if it were wise or tenable for the judicial branch to engage in such a task, a doubtful proposition. Indeed, none of our prior cases have found impartiality lacking under § 19-124(C) based on an issue or term being too emotional or controversial. The Committee also has not explained how a proper role of the judiciary includes suppressing a phrase that appears in existing law—and is even a dictionary definition of the proposed alternative term—on the basis that it may be too sensitive for public consumption.   In addition, the Committee seeks a re-write of the Analysis in a manner that favors the Initiative, which violates § 19-124(C)'s impartiality requirement.

¶47        The Council's approach is the only clear path to achieving impartiality under the circumstances.   The existing law, including its specific terminology, reflects the policy and moral choice of the people through their elected representatives.   The Initiative, including its different terminology, reflects the policy and moral change offered to voters.  *See Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 153 ¶ 63 (2024) ("The abortion issue implicates morality and public policy concerns,

20

and invariably inspires spirited debate and engenders passionate disagreements among citizens."). By accurately describing existing law in its present form and what the law will become if voters approve the Initiative, the Analysis allows a fully informed electorate to decide for themselves the moral and policy questions raised by the Initiative.

¶48 Our dissenting colleagues argue that our inquiry should focus solely on whether one statutory phrase, "unborn human being," viewed in isolation, makes the entire Analysis partial. *Infra* ¶¶ 71, 83. But the proper inquiry is whether the Analysis itself is "reasonably impartial," *Howe*, 192 Ariz. at 383 ¶ 17, and substantially complies with § 19-124(C), *Tobin*, 231 Ariz. at 193 ¶ 11. To determine whether the Analysis is impartial, this Court must not consider one phrase in isolation, but instead must consider it in the context of the entire Analysis. *See, e.g.*, *BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 21 ¶ 19 (2018) ("We must not interpret terms in isolation, but rather in their overall context."); *Protect Our Ariz. v. Fontes*, 254 Ariz. 288, 291 ¶ 1 (2023) (reviewing an initiative description "in its entirety" to determine whether it communicates objectively false or misleading information).

¶49 The dissent would affirm the superior court's judgment requiring the Council to remove "unborn human being" found in existing law and replace it with "neutral terminology." *Infra* ¶ 71. We recognize that the Council's role is to draft the analysis, and this Court's role under § 19-124(C) is to determine whether such analysis is impartial. But it is notable that neither the dissent nor the superior court explores how any such "neutral terminology" could even be drafted in a manner that would conform to what is in existing law. And while the dissent argues that "unborn human being" promotes a "value judgment," it does not suggest how "fetus" (the Committee's preferred term) is any less of a "value judgment" or any less "tinged with partisan coloring" than "unborn human being" in existing law. *Infra* ¶¶ 77–78. Indeed, if "fetus" were used, the Council would have deviated from existing law's text and placed its thumb on the scale in favor of the Initiative under the guise of "neutral terminology."

¶50 The dissent, like the Committee, supports an analytical framework that would require judges to determine whether a particular subject matter is "hotly contested" or a "value judgment" that raises

"difficult moral, philosophical, and theological questions." *Infra* ¶¶ 77–78, 83. But the dissent has not offered a judicially manageable standard for determining what makes a subject matter too contentious in the eyes of the public, such that the judiciary must order the removal of certain language. Although this Court has set forth a standard to determine whether an analysis itself is impartial under § 19-124(C), *supra* ¶ 13, it tellingly has never articulated a standard to determine whether a subject matter or an accurately-defined statutory term is too emotional or too controversial for public viewing under § 19-124(C).

**¶51** Further, the dissent poses a hypothetical where "sweet, innocent baby" appears in statute and the Council uses that phrase in an analysis. *Infra* ¶ 73. We agree with our colleagues' acknowledgment that this example is "far-fetched." But beyond that, this hypothetical phrase is materially different from "unborn human being." There is no dispute that, in the context of this case, a "fetus" (whether pre- or post-viability) is in fact "unborn" and "of the species homo sapiens" (the definition of "human being" in § 36-2321(5)). The issue we must decide is whether a Council analysis accurately presents statutory text in an impartial manner, without partisan coloring or advocacy for what the legislature enacted or what a proposed measure offers as an alternative. If it does that, as the Analysis does here, the Council has substantially complied with § 19-124(C).

**¶52** Finally, the dissent argues that "unborn human being" is "'tinged with partisan coloring' when used in describing the Initiative's impact." *Infra* ¶ 77. Not so. The Analysis exclusively uses "fetus" and "fetal" in describing what the Initiative will do if passed. The Analysis uses "unborn human being" *one time* when accurately reciting "[c]urrent state law," which was appropriate background information. *See* § 19-124(C).

**¶53** Distilled to its essence, the Committee and dissent's approach endeavors to sanitize emotion and controversy from the weighty moral and public policy decision of whether to expand access to abortion under the guise of § 19-124(C)'s impartiality requirement. This approach is unwise and intrudes upon the prerogative of the legislative branch of government, both the legislature and the people. The law requires impartiality in the manner the Council describes the current law, the proposed changes to the

law, and the effect of such changes.   The Analysis precisely quotes from the current law, accurately details the Initiative's proposed changes, and describes the effect of the changes without value judgment or commentary. This was the only clear path to impartiality in these circumstances.   We must trust our citizens to make fully informed judgments about the laws that govern our society.   The court's role is to ensure that the voting public, in determining the path forward, is informed of the current state of the law and how it would change under the proposed measure.

¶54      In conclusion, the purpose of an analysis "is to assist voters in rationally assessing an initiative proposal by providing a fair, neutral explanation of the proposal's contents and the changes it would make if adopted."   *Greene*, 180 Ariz. at 590.   While some groups may prefer "fetus" and others prefer "unborn human being," under these circumstances it would not be fair or neutral to change the first sentence of the Analysis to "fetus," contrary to the text of existing law.   *See id.* Following the text of each—the current statute and the proposed measure—without modifying the terminology in either is an impartial approach that puts voters on notice of exactly what the measure will change.   It allows voters to understand the full nature of their decision and rationally assess whether to vote for or against the Initiative because they agree or disagree with relevant existing law.   It is up to a fully informed electorate, when deciding whether to vote for or against the Initiative, to decide which terminology to support or reject.

¶55      This Court risks improper judicial interference if it selectively omits or alters the "unborn human being" terminology used in the text of existing law.   We decline to deprive voters of relevant, accurate information under the guise of impartiality.

¶56      For these reasons, the Analysis's use of "unborn human being" one time when accurately describing existing law is not lacking in neutrality or argumentative as a matter of law.   *See Howe*, 192 Ariz. at 384 ¶ 19 ("On this record, deference must be given to the Council's judgment. Giving due deference, we cannot say that the Council's use of names most easily recognized by voters is, as a matter of law, so overemphasized as to be misleading, inaccurate, lacking in neutrality, or argumentative.").   The Analysis substantially complies with § 19-124(C).   *See Tobin*, 231 Ariz.

at 193 ¶ 11.[2]

**¶57**      To be clear, we do not adopt a bright-line rule that an analysis is impartial as a matter of law just because it recites statutory language. *See* § 19-124(C).   Our lengthy examination of the issue before us, in the context of the entire Analysis and all relevant provisions in § 19-124(C), demonstrates this point.   In the event of a challenge, courts must undertake an analysis—as we have done here—to determine whether the Council has substantially complied with § 19-124(C)'s impartiality requirement.

## CONCLUSION

**¶58**      We reverse the judgment of the superior court.   The Committee requests attorney fees under A.R.S. § 12-2030(A) and the private attorney general doctrine.   *See Dobson v. State ex rel. Comm'n on App. Ct. Appointments*, 233 Ariz. 119, 124 ¶ 18 (2013).   The Committee also requests its taxable costs on appeal under A.R.S. §§ 12-341, -342.   Because the Committee is not the successful party in this action, we deny its request for attorney fees and costs.

---

[2] The Committee argued extensively in the superior court and this Court that the Analysis should be revised to use "fetus" instead of "unborn human being."   In this Court, the end of the Committee's brief summarily states that "[t]he Committee also has no objection to the term 'pregnancy' as suggested by the Attorney General's amicus brief below."   But the Committee did not sufficiently develop this argument in this Court, and we therefore decline to address it.   *See Harris v. Warner*, 255 Ariz. 29, 32 ¶ 10 n.1 (2023) (considering an argument waived that a party did not develop); *State v. Johnson*, 247 Ariz. 166, 180 ¶ 13 (2019) (declining to consider an argument the party failed to develop).   We further note that amici are not permitted to create, extend, or enlarge the issues on appeal.   *See Vangilder v. Ariz. Dep't of Revenue*, 252 Ariz. 481, 493 ¶ 46 (2022).

MONTGOMERY, J., concurring.

**¶59**        I fully concur in the majority's analysis and conclusion.   I write separately to underscore what this case is not about and to further highlight the impartiality of the Analysis.   I also write separately to address the dissent's approach to determining impartiality.

**I**

**¶60**        This case, as a reminder, is not about the substance of the Initiative beyond what was necessary to determine whether the Council substantially complied with A.R.S. § 19-124(C).   *See, e.g.*, *League of Ariz. Cities & Towns v. Brewer*, 213 Ariz. 557, 559 ¶ 10 (2006) (observing that "just as the courts may not predetermine the substantive validity of the legislature's measures, so too must they refrain from predetermining the substantive validity of the people's initiatives, even if the 'legislation might conflict with the Arizona Constitution or state law'" (quoting *Winkle v. City of Tucson*, 190 Ariz. 413, 415 (1997))).   And this case does not address the merits of the arguments for and against the Initiative.   The sole matter this Court considered was whether the Council substantially complied with § 19-124(C).

**II**

**¶61**        Section 19-124(C) requires the Council to "prepare and file with the secretary of state an impartial analysis of the provisions of each ballot proposal of a measure or proposed amendment," which "shall include a description of the measure and shall be written in clear and concise terms avoiding technical terms wherever possible."   Additionally, "[t]he analysis may contain background information, including the effect of the measure on existing law . . . if the measure . . . is approved or rejected." § 19-124(C).   In carrying out its duties, the Council may not use argument or advocacy to present the meaning of a measure, the changes it would make, or any effect on existing law.   *Supra* ¶ 13.   And, as noted, the Council cannot mislead by amplification, omission, or fallacy, or use language "tinged with partisan coloring" in *presenting* the text of a statute or initiative.   *See Tobin v. Rea*, 231 Ariz. 189, 194 ¶ 13 (2013) (quoting *Fairness & Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 590 (1994)).   Accordingly, in this case, the focus is on the language the Council used to

25

present the effect the Initiative would have on § 36-2322, not on the language quoted directly from § 36-2322.[3]

**¶62** For example, borrowing from the dissent's hypothetical, *infra* ¶ 73, if the Analysis accurately quoted the specific language of § 36-2322(B) but presented it as "protecting the rights of a sweet innocent baby," the Analysis would have impermissibly used language "tinged with partisan coloring." Or, from a contrasting point of view, if the Analysis presented § 36-2322(B) as "restricting abortion rights," the Council would also violate § 19-124(C). However, if § 36-2322(B) used the phrase "sweet innocent baby," then accurately quoting the statute without more is insufficient to conclude the Analysis was not impartial.

**¶63** Here, the Analysis does no more and no less than accurately set forth language in the statute without any characterization. Likewise, the Analysis permissibly uses the terms "fetus" and "fetal viability" from the Initiative. Although both are technical terms that § 19-124(C) counsels to avoid whenever possible, the Analysis is merely setting forth the actual terms used.

### III

**¶64** The dissent concludes that because it is hotly contested "[w]hether an embryo or fetus is a 'human being,'" the Analysis's use of the phrase "unborn human being" is "tinged with partisan coloring." *Infra* ¶ 77. The dissent's conclusion, though, illustrates the problem with this approach to determining impartiality. And the reliance on cases decided before *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), is misplaced.

**¶65** Relying on the nature of an issue to determine impartiality raises more questions than it answers. How hotly contested does an issue have to be before simply quoting language from the relevant statute renders the analysis "tinged with partisan coloring"? Would this require the use

---

[3] Accordingly, the dissent's concern that impartiality could be determined by only looking at language quoted from a statute is misplaced. *See infra* ¶¶ 73–74.

of experts to determine just how contested an issue is?   Must we poll the electorate?   Inviting the Council, or this Court in a future case, to censor language validly enacted by the legislature or proposed by initiative due to the nature of a controversy opens a Pandora's box.

¶66        In addition to the other cases cited, the dissent relies on Justice Scalia's musing that "[whether] the human fetus is in some critical sense merely potentially human" is not "a legal matter; it is in fact a value judgment."   *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 982 (1992) (Scalia, J., concurring in part and dissenting in part), *overruled by Dobbs*, 597 U.S. 215.   *Infra* ¶ 78.   This reliance, though, is misplaced.   Careful consideration of Justice Scalia's concurrence—and an equally careful reading of the other cases—reflects a disagreement deeper than just defining the point at which a human life begins.   Best understood, the disagreement concerns where along the continuum of human existence, and to what degree, legal significance attaches.   *See, e.g.*, *State v. Merrill*, 450 N.W.2d 318 (Minn. 1990) (considering constitutionality of unborn child homicide statutes).   Justice Scalia's further observation in *Casey* illustrates this point.

¶67        In *Casey*, Justice Scalia also noted that "[s]ome societies have considered newborn children not yet human, or the incompetent elderly no longer so."   505 U.S. at 982.   A "value judgment" associated with the phrase "incompetent elderly people are human beings" arises from differences in the legal significance some societies attach to that point of human existence.   Regardless, the phrase is objectively accurate: incompetent elderly people are human beings.   "Unborn human being" is also objectively accurate.

¶68        Aside from any philosophical, theological, or moral point of view, there is a scientific consensus that human life—versus merely potential human life—begins at fertilization:

> [F]ertilization marks the point at which a male's spermatozoon (sperm) and a female's oocyte (egg) unite to form a genetically unique organism (zygote) [and at which] a zygote with a human genome *is a human* since he or she would then be biologically classified as a member of the Homo sapiens species *whose life has started* on the developmental

> path that can continue through the zygotic, embryonic, fetal, infant, child, adolescent, and adult stages of the human life cycle.

Steven Andrew Jacobs, J.D., Ph.D., *The Scientific Consensus on When a Human's Life Begins*, 36 Issues L. & Med. 221, 224 (2021) (emphasis added) (discussing results of a study "designed to assess biologists' views on the ontogenetic starting point of a human's life" given that 80% of surveyed Americans selected biologists as "most qualified to determine when a human's life begins"). Thus, the phrase "unborn human life" has an objective accuracy independent of any value judgment.

**¶69** As explained above, the Analysis uses the phrase solely in the context of quoting existing statutory language without characterizing the phrase in any way that renders the Analysis impermissibly partial. The mere fact that the phrase might also be used in debates concerning the legal rights and statuses that ought to be afforded (or not) to human fetuses/unborn human beings does not render *this* use of the phrase partial.

## IV

**¶70** Here, the majority has fairly applied the requirements of § 19-124(C) to the Analysis. Anything more or less would require the Court to exercise its own "value judgment" with respect to language properly left for the people of Arizona, rather than the Court, to pass on.

TIMMER, C.J., joined by BEENE, J., dissenting.

**¶71** Few disputes are more politically, morally, philosophically, and emotionally divisive than whether and at what stage a pregnant woman carries an "unborn human being." *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 223–25 (2022) (acknowledging that "[a]bortion presents a profound moral issue on which Americans hold sharply conflicting views" and explaining that some people "believe fervently that a human person comes into being at conception and that abortion ends an innocent life"); *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 153 ¶ 63 (2024) ("The abortion issue implicates morality and public policy concerns, and invariably inspires spirited debate and engenders passionate disagreements among citizens."). By using the term "unborn human being" in its analysis of the Arizona Abortion Access Act Initiative (the "Initiative"), the Legislative Council favored a side in that dispute, in violation of A.R.S. § 19-124(C)'s impartiality requirement. Consequently, I would affirm the superior court's judgment, which required the Council to redraft the analysis using neutral terminology.

**¶72** The majority reaches a different conclusion. It reasons that the Legislative Council "substantially complied" with § 19-124(C) because the term "unborn human being" is used in A.R.S. § 36-2322(B), which restricts abortion rights, and the Council's analysis accurately describes how that statute would be affected by the Act. *See supra* ¶¶ 3, 36. In my view, we cannot conclude that the Council's analysis is impartial simply because "unborn human being" is used in § 36-2322(B). The Legislature is free—as an independent branch—to choose partial or even inaccurate statutory language without judicial oversight. But the Legislative Council—a statutory agency—is not unconstrained in drafting an analysis for use in the publicity pamphlet. *See Fairness & Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 588–89 (1994) (stating that the Council fulfills an administrative or ministerial role and does not act in a legislative capacity). Section 19-124(C) requires the Council to use impartial language, leaving advocacy to supporters and opponents of the Initiative. It is for the courts to decide whether the Council complied with that directive. *See Greene*, 180 Ariz. at 590. Because that directive is to produce an impartial analysis, I disagree with my colleagues that prohibiting the Council from injecting "emotion and controversy" into a legislative analysis "intrudes upon the prerogative of the legislative branch

29

of government, both the legislature and the people" or that this Court "risks improper judicial interference" by doing so.   *See supra* ¶¶ 53, 55.

¶**73**     If we conclude that the Council always complies with § 19-124(C) when repeating language used in affected statutes, impartiality would simply mean whatever the majority of legislators had voted to use in statutes.   To illustrate with a far-fetched example, if the legislature had used the term "sweet, innocent baby" in § 36-2322(B), I doubt anyone would view that term as "impartial" if used in describing an abortion-related measure, although it would be accurate to say that the term is used in the statute.   Our job is to determine whether the analysis is impartial as required by § 19-124(C), meaning we cannot rubberstamp language as "impartial" merely because the legislature used it in an affected statute.

¶**74**     To be fair, the majority states it is not "adopt[ing] a bright-line rule that an analysis is impartial as a matter of law just because it recites statutory language."   *See supra* ¶ 57.   But with respect, because the majority does not rest its determination that the term "unborn human being" is impartial on anything other than its use in § 36-2322(B), it is difficult to see how the majority is not relying on such a line here.

¶**75**     Curiously, the majority concludes that courts have no business deciding whether language used in a legislative analysis is "packed with emotional and partisan meaning," "hotly contested," or "too contentious" to comply with § 19-124(C).   *See supra* ¶¶ 46, 50.   It criticizes the Committee and this dissent for failing to suggest a "judicially manageable standard" for determining whether language falls into such categories.   *See id.*   Of course, if a judicially manageable standard does not, in fact, exist, compliance with § 19-124(C) would be a nonjusticiable political question, and we should decline to address it.   *See Kromko v. Ariz. Bd. of Regents*, 216 Ariz. 190, 192 ¶ 11 (2007) (stating that a controversy is a "nonjusticiable" political question where there is "a lack of judicially discoverable and manageable standards for resolving it" (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993))).   But the majority conducts a self-described "lengthy" analysis that belies its no-standards criticism.   *See supra* ¶ 57.   And this Court has assessed compliance with § 19-124(C) many times.   *See Greene*, 180 Ariz. at 590 ("Section [19-124(C)] would be meaningless if this court had no power to review the actions of the Council

and determine whether it carried out its statutory responsibility to prepare an impartial analysis and description of [an initiative].").

**¶76** To be clear, a judicially manageable standard exists for assessing compliance with § 19-124(C). In *Greene*, this Court set out that standard, holding that the statute "requires the legislative council to produce a neutral explanation of initiative proposals, avoiding argument or advocacy, and describing the meaning of the measure, the changes it makes, and its effect if adopted." *Id.* at 591. Later decisions have applied and augmented this holding. *See Tobin v. Rea*, 231 Ariz. 189, 194 ¶ 13 (2013) (stating that language "must be free from any misleading tendency, whether of amplification, of omission, or of fallacy, and it must not be tinged with partisan coloring" (quoting *Greene*, 180 Ariz. at 590)); *Citizens for Growth Mgmt. v. Groscost*, 199 Ariz. 71, 72 ¶ 4, 73 ¶ 6 (2000) ("*CGM*") (same and adding that the use of "rhetorical strategy" in phrasing the analysis "is not impartial"); *Ariz. Legis. Council v. Howe*, 192 Ariz. 378, 383 ¶ 16 (1998) ("Put another way, the language must not mislead, be 'tinged with partisan coloring,' or argue for one side or the other." (quoting *Greene*, 180 Ariz. at 590)).

**¶77** Turning to the legislative analysis here, I conclude that the term "unborn human being" is "tinged with partisan coloring" when used in describing the Initiative's impact. *See Howe*, 192 Ariz. at 383 ¶ 16 (quoting *Greene*, 180 Ariz. at 590). Whether an embryo or fetus is a "human being" with attendant self-awareness, emotions, and a soul is hotly contested and ultimately turns on individual beliefs. *See, e.g., State v. Merrill*, 450 N.W.2d 318, 324 (Minn. 1990) ("People are free to differ or abstain on the profound philosophical and moral questions of whether an embryo is a human being, or on whether or at what stage the embryo or fetus is ensouled or acquires 'personhood.'"); *Ark. Women's Pol. Caucus v. Riviere*, 677 S.W.2d 846, 849 (Ark. 1984) ("[T]here are three schools of thought on the issue of when life begins; at conception, upon live birth, or at the point upon which the fetus becomes viable."); *Margaret S. v. Treen*, 597 F. Supp. 636, 661 (E.D. La. 1984) (finding that the evidence "established that [the terms 'fetus' or 'conceptus'] are medically accepted terms, unlike the term 'unborn child,' which could . . . imply[] that [the woman] is taking the life of a person"). The majority implies that this debate ended with *Dobbs* and perhaps for that reason does not directly address whether "unborn human being" is a partial or impartial term. *See supra* ¶¶ 39–43

31

(dismissing the impact of like statements in two cases because they relied on *Roe v. Wade*, 410 U.S. 113 (1973), which was overruled by *Dobbs*). The debate about when a "human being" comes into existence, however, did not end with *Dobbs* and rages today. *See State v. Prince*, 226 Ariz. 516, 541 ¶ 104 (2011) (stating the Court will take judicial notice of facts that are "so notoriously true as not to be subject to reasonable dispute").

¶78 As Justice Scalia once put it, "[whether] the human fetus is in some critical sense merely potentially human" is not "a legal matter; it is in fact a value judgment." *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 982 (1992) (Scalia, J., concurring in part and dissenting in part). In starting the legislative analysis by using the term "unborn human being" when paraphrasing the statute that currently prohibits abortions after fifteen weeks' gestation, the Council promoted the value judgment that a fetus is a "human being." For that reason, I cannot find that the legislative analysis is impartial.

¶79 Notably, during the Legislative Council's hearing to adopt the analysis, Speaker Toma acknowledged that "unborn human being" and "fetus" are both "charged [terms] depending on which side you're on" but concluded they could both be used to balance against each other. We have rejected this position before. Section 19-124(C) requires the Legislative Council to use neutral language, not select non-neutral terminology to balance opposing viewpoints. *See CGM*, 199 Ariz. at 73 ¶ 11 (rejecting "a whole-is-greater-than-the-sum-of-its-parts theory," which would permit "finding the entire analysis impartial even though certain sentences or paragraphs are not"); *see also Healthy Ariz. Initiative PAC v. Groscost*, 199 Ariz. 75, 78 ¶ 9 n.3 (2000) (addressing the similar impartiality requirement for describing the fiscal impact of ballot measures and rejecting a framework where "one partisan summary could presumably be neutralized by the other, similar to offsetting penalties in an athletic contest"). Such terminology should have been reserved to the "for" and "against" arguments separately published in the publicity pamphlet. *See* § 19-124(D). Indeed, among the many arguments ultimately published, only the "against" arguments used terms like "human being," "unborn child," "unborn baby," and "unborn children." *See* Arizona 2024 General Election Publicity Pamphlet, November 4, 2024, at pp. 161–222.

**¶80** The majority acknowledges the persuasive impact of using the term "unborn human being." *See supra* ¶ 37 ("Certain voters may find the existing statutory law's reference to 'unborn human being' and the Initiative's reference to 'fetus' and 'fetal' important enough to tip the scale in favor of voting for or against the Initiative."). Regardless, it views the Council's word choice as merely teeing up for voters a terminology question the Court should not take sides on: "It is up to the informed voters of Arizona—not this Court in its impartiality analysis—to decide which terminology is preferred in Arizona law." *See supra* ¶ 42. But word choice in Arizona law was not the issue in the Initiative. Indisputably, the Initiative did not give voters the option of inserting the term "unborn human being" into Arizona law. The issue posed to voters by the Initiative was whether to enshrine in the Arizona Constitution that "[e]very individual has a fundamental right to abortion," and that the state is prohibited from "enact[ing], adopt[ing] or enforc[ing]" laws that (1) restrict that right "before fetal viability," with a limited exception; (2) restrict that right "after fetal viability," if "necessary to protect the life or physical or mental health of the pregnant individual"; or (3) penalize people for assisting pregnant individuals in exercising this right. Our role was to decide whether the Council's analysis of that Initiative was impartial. § 19-124(C).

**¶81** In *Tobin*, this Court held that including the phrase "tax increase" in the first paragraph of an analysis could "persuade the reader at the very outset" that the initiative runs counter to his or her financial interests. 231 Ariz. at 195 ¶ 18 (quoting *CGM*, 199 Ariz. at 72 ¶ 6). Here, it is just as likely that the phrase "unborn human being" could persuade the reader from the get-go that the Initiative is contrary to his or her moral interests. *See Riviere*, 677 S.W.2d at 848–49 (disallowing use of "The Unborn Child Amendment" as "a clear-cut example of the partisan coloring of ballots" because "[v]ery few would vote against a child, born or unborn, even though they are for a woman's right to have an abortion"). Using the term, particularly to start the analysis, put a thumb on the scale favoring defeat of the Initiative and should not have been permitted under § 19-124(C).

**¶82** The majority criticizes the superior court and this dissent for failing to both explore what "neutral terminology" the Council should have used and explain how the term "fetus" is not similarly "tinged with

partisan coloring." *See supra* ¶ 49. With respect, the majority misapprehends the courts' role in assessing compliance with § 19-124(C). It is not our role to write the legislative analysis. Our only function is to decide whether the drafted analysis is impartial. *See* § 19-124(C). If we find that the Legislative Council did not comply with the statute, we should explain why and allow the Council to redraft the analysis in an impartial manner. In my view, courts should resist micromanaging the Council's job by suggesting compliant language; that would constitute judicial interference with the Council's function. That is particularly so here as no party has suggested that the terms "unborn human being" and "fetus" or "fetal" could not have been avoided in drafting an accurate and impartial analysis.

**¶83** As the superior court judge concluded, "[t]he term 'unborn human being' is packed with emotional and partisan meaning, both for those who oppose abortion and for those who endorse a woman's right to choose whether to have an abortion." Instead of teeing up a neutral analysis that left voters to decide for themselves the difficult moral, philosophical, and theological questions raised by the Initiative, the Legislative Council used adversarial language that favored one side in the abortion debate. That violated § 19-124(C). With great respect for my colleagues, I dissent.